IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 2, 2025

**BETTY SPARKS v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Hardeman County**
**No. 20-CR-28      J. Weber McCraw, Judge**

———————————————————

**No. W2025-00154-CCA-R3-PC**

———————————————————

Petitioner, Betty Sparks, appeals the denial of her post-conviction petition alleging that the post-conviction court erred in finding that she received the effective assistance of counsel at trial. Following our review of the entire record and the briefs of the parties, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, P.J., and CAMILLE R. MCMULLEN, J., joined.

Jamie L. Davis, Adamsville, Tennessee, for the appellant, Betty Sparks.

Jonathan Skrmetti, Attorney General and Reporter; Park Huff, Assistant Attorney General; Mark E. Davidson, District Attorney General; and Falen Chandler and Joe VanDyke, Assistant District Attorney Generals, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

This case arose when Deon Turner was shot and killed and Desiree White was severely wounded during an attempted robbery. Petitioner, along with co-defendants, Steven Sparks, Michael Mayfield, Jr., and Kaci Burcham, was indicted for first degree premeditated murder (count 1), first degree felony murder (count 2), attempted first degree murder (count 3), attempted first degree felony murder (count 4), aggravated assault with serious bodily injury (count 5), and attempted especially aggravated robbery (count 6).

*State v. Sparks*, No. W2021-01213-CCA-R3-CD, 2022 WL 17176752, at * 1 (Tenn. Crim. App. Nov. 23, 2022) *perm. app. denied* (Tenn. Mar. 9, 2023).

*Suppression Hearing*

Petitioner filed a pretrial motion to suppress a statement she made to Tennessee Bureau of Investigation ("TBI") Special Agent Celinda Davidson, arguing that she did not waive her *Miranda*[1] rights, thereby rendering her statement involuntary. *Id.* Petitioner further argued that her interaction with Special Agent Davidson constituted custodial interrogation because the interview occurred at the Hardeman County Sheriff's Office ("HCSO"), it included questions from the initial interview as well as new questions, and because Special Agent Davidson's report was "devoid of any reference that the [Petitioner] was free to refrain from answering questions." *Id.*

At the suppression hearing, Special Agent Davidson testified that she was assigned to assist in the investigation and was at the HCSO on March 25, 2019, in that capacity. *Id.* She was walking through the lobby, observed Petitioner, and stopped to speak with her. Petitioner was not a suspect at the time but had given a *Mirandized* statement several days earlier about Mr. Turner's murder. *Id.* Petitioner was not in custody at the time, and Special Agent Davidson did not *Mirandize* Petitioner before speaking with her. She and Petitioner spoke in the crowded lobby for "less than five minutes," and Petitioner did not attempt to leave nor did she state that she did not want to speak with Special Agent Davidson. *Id.* After the conversation, Special Agent Davidson prepared an investigative report and attached it to the case file. *Id.*

The trial court denied Petitoner's suppression motion finding that Petitioner's conversation with Special Agent Davidson was not a custodial interrogation. *Id.* Petitioner then proceeded to trial. *Id.*

*Trial*

The proof at trial showed that on March 21, 2019, Ms. White was spending the night at the home of Mr. Turner, her boyfriend. At some point during the night, Mr. Turner woke up Ms. White, stating that he had been shot. *Id.* at *2. Ms. White immediately realized that she had also been shot. Mr. Turner helped her to the car and drove to the home of his stepbrother, Tyler Sims. *Id.*

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 444 (1966) (holding any statement made by the accused during a custodial interrogation without the benefit of procedural safeguards is inadmissible in court).

Mr. Sims woke up at 5:45 a.m. to the sound of a car horn honking.  He went outside and saw that Mr. Turner was "pouring blood."  Mr. Turner said: "[t]hey got me two or three good times," but he refused to say who had shot him.  *Id.*  Mr. Sims helped Mr. Turner into the house and told Mr. Sims' girlfriend to call 911.  Mr. Sims again heard a car horn honking outside and discovered Ms. White, who had lost consciousness while on the way to Mr. Sims' house, sitting in the passenger seat of Mr. Turner's vehicle.  *Id.*  Mr. Sims took Ms. White inside and placed her in a recliner and tried to keep her awake but she "was passing in and out on [him] the whole time."  *Id.*  Medical personnel arrived and placed Mr. Turner and Ms. White into an ambulance and drove them to a nearby church where they were taken to the hospital by helicopter.  *Id.*  It was later determined that Mr. Turner was shot seven times: twice in the chest, once in the abdomen, twice in the right arm, once in the left arm, and once in the left leg.  He later died from the wound to his abdomen.  Ms. White suffered two gunshot wounds but survived her injuries.  *Id.* at *6.

Kaci Burcham testified that she was in a relationship with Petitioner's son, Steven Sparks.  She said he was pulled over by police on March 15, 2019, and arrested after officers discovered ecstasy pills in his vehicle.  *Id.* at *2.  Petitioner and Ms. Burcham then began raising money to pay Mr. Sparks' bail.  Mr. Turner told them that he would contribute one thousand dollars.  *Id.*  However, when Mr. Turner did not give the money to Petitioner, she obtained a loan in Mr. Sparks' name and bailed him out of jail on March 20, 2019.  *Id.*  Petitioner was upset that Mr. Turner did not give her the money as promised, and she told Ms. Burchum not to post anything on Facebook about Mr. Sparks being released from jail because "she was still going to try getting the money [from Mr. Turner] because [they] needed it."  *Id.*  That evening, Ms. Burcham overheard Petitioner tell Mr. Sparks that she had messaged Mr. Turner, but he had not brought the money, so "she wanted it took care of."  *Id.*  Ms. Burcham assumed that meant Petitioner wanted Mr. Turner "taken care of."  Mr. Sparks responded that he did not want to discuss it, and Petitioner replied, "I'm just saying it needs to be took care of."  *Id.*  Ms. Burchum testified that Mr. Sparks had not made any plans regarding Mr. Turner.

Mr. Sparks came home from work the following day and told Ms. Burcham that Mr. Turner, who was his co-worker, had quit his job, and some of his other co-workers said that Mr. Sparks' arrest "was a setup."  *Id.*  Mr. Sparks told Ms. Burcham that "he had business to take care of" and there was "no other way to handle it."  Ms. Burcham knew that Mr. Sparks was referring to Mr. Turner.  *Id.*  Mr. Sparks then texted someone about purchasing a gun, and he and Ms. Burcham met someone and purchased a black .9-millimeter handgun.  *Id.*  Mr. Sparks called his friend, Michael Mayfield, Jr., and said that he needed Mr. Mayfield's help with something.  *Id.*  Mr. Sparks and Ms. Burcham picked Mr. Mayfield up at his girlfriend's house and drove to Walmart in Corinth, Mississippi at approximately 1:30 a.m. and purchased .9-millimeter ammunition, shotgun shells, Remington gun oil, a backpack, a black pullover, and a hatchet.  After leaving Walmart,

they stopped at a gas station, and Mr. Sparks purchased a black toboggan. *Id.* They also picked up another friend, Terry Martindale, and drove back to Mr. Sparks' apartment, where they used methamphetamine and smoked marijuana, and Mr. Sparks dispersed weapons and clothing. *Id.* Mr. Martindale was given a shotgun and a ghillie suit, Mr. Mayfield was given the backpack, hatchet, and a pistol, and Mr. Sparks retained the .9-millimeter gun purchased earlier. Ms. Burcham was to drive the others to and from Mr. Turner's house. *Id.*

Before the group left the apartment, Mr. Sparks informed them that they were going to Mr. Turner's house to kill him and steal his ecstasy pills along with anything else they could take. *Id.* at *3. Ms. Burcham testified that while Mr. Sparks was in jail, she and Petitioner went to Mr. Turner's house several times to wait for him to give them bail money. Petitioner implied that she knew Mr. Turner kept his ecstasy pills in his top dresser drawer. *Id.*

Approximately twenty-five minutes after dropping Mr. Sparks, Mr. Mayfield, and Mr. Martindale off at Mr. Turner's house, Ms. Burcham drove back to the house but did not see anyone. *Id.* Mr. Sparks and Mr. Mayfield eventually made their way back to the car, but they were unable to locate Mr. Martindale, who went to a nearby house. Mr. Martindale got a ride to a gas station, and Mr. Sparks asked Petitioner to retrieve him and drive him back to Mr. Sparks' apartment. *Id.* At the apartment, Mr. Sparks yelled at Mr. Martindale for getting lost and leaving the ghillie suit and shotgun in the woods. Petitioner asked Mr. Sparks if "it was took care of," and Mr. Sparks replied that "[i]t should be" because he "unloaded a whole clip." *Id.*

From Petitioner's questions, Ms. Burcham concluded that Petitioner knew what Mr. Sparks had planned to do to Mr. Turner that night. Petitioner agreed to take Mr. Mayfield home and said that she would "see what [she could] find out. [She would] drive by" Mr. Turner's house. *Id.* Before everyone left Mr. Sparks' apartment, he told them that "if [they] thought about it, prayed about it, [or] spoke to anybody else about it, . . . he would kill [them]." *Id.*

Ms. Burcham drove Mr. Sparks to work and then burned the boots he wore during the murder. *Id.* The following day, Mr. Sparks and Petitioner also burned the bandana and black toboggan he wore. *Id.* To create an alibi for the murder, Mr. Sparks directed Ms. Burcham to say that they were at a friend's house in Mississippi all night. Additionally, due to the scratches on Mr. Martindale's face from running in the woods, Petitioner and Mr. Sparks created a story that Mr. Martindale and Mr. Mayfield got into an argument about fentanyl in the backseat of the car, and Mr. Mayfield scratched Mr. Martindale's face with a fork. *Id.*

On cross-examination, Ms. Burcham testified concerning the statements she gave the TBI following the murder. She said that she did not tell the truth in her first statement because she was afraid of Mr. Sparks. *Id.* Ms. Burcham also acknowledged that she did not tell investigators until the week of trial about burning the boots. On redirect examination, Ms. Burcham agreed that her proffer to the TBI was the truth and her "lawyer was surprised because he didn't know all of it." *Id.*

Mr. Mayfield testified about his involvement in the murder, noting that Mr. Sparks called him at 10:00 p.m. and said that he was coming over. Mr. Mayfield told Mr. Sparks that it was not a good idea, but Mr. Sparks and Ms. Burcham showed up, and Mr. Sparks told Mr. Mayfield that he needed him to "ride with him somewhere." *Id.* Mr. Mayfield did not want to go but because he owed Mr. Sparks money for a prior drug deal, he went with him. *Id.*

According to Mr. Mayfield, the group left his house, went to Walmart, and purchased equipment that Mr. Sparks explained was for "camping." Thereafter, they picked up Mr. Martindale and drove back to Mr. Sparks' apartment. *Id.* They "smoked some weed," and Mr. Sparks told Mr. Mayfield to go in the bedroom and "grab" what was on the bed. Mr. Mayfield picked up a shotgun and a chrome pistol that he recognized as belonging to Petitioner. *Id.* Mr. Sparks gave the shotgun and a ghillie suit to Mr. Martindale and told everyone "that his dope boy had owed him some money and we was going to take his money." *Id.*

Ms. Burcham stopped the car near Mr. Turner's house, and Mr. Martindale went into the woods, and Mr. Sparks told Mr. Mayfield to follow him. *Id.* at *4. They approached the back of Mr. Turner's house and entered through the back door into the kitchen. Mr. Sparks then began looking through kitchen drawers as well as a Walmart bag sitting on the counter. *Id.* The men entered the living room, and Mr. Mayfield could see the light from a television in Mr. Turner's bedroom. As Mr. Sparks walked toward the bedroom, Mr. Mayfield turned toward the back door when he "heard a bunch of gunshots go off." *Id.* Mr. Mayfield stood frozen at the back door until he felt Mr. Sparks push past him out the door, and they began running down the road. *Id.*

Ms. Burcham then drove Mr. Mayfield and Mr. Sparks back to Mr. Sparks' apartment. Petitioner picked up Mr. Martindale at a gas station and drove him to the apartment where he and Mr. Sparks argued about Mr. Martindale leaving the ghillie suit and shotgun in the woods. Petitioner asked Mr. Sparks if "he had got anything and he said no but he took care of it." *Id.* At that point, Mr. Mayfield "knew [Petitioner] had knowledge about [the murder]." *Id.* Mr. Mayfield asked Petitioner to drive him home, and Mr. Sparks told Mr. Mayfield to go to the woods to collect the ghillie suit and shotgun.

However, Mr. Mayfield had lost his glasses while running from Mr. Turner's house so Petitioner said that she would get the items. *Id.*

Petitioner and Mr. Mayfield drove toward Mr. Turner's house; however, there was an investigator blocking the street who asked where they were going. Petitioner froze, so Mr. Mayfield said that he was going to get his driver's license from his ex-girlfriend's house. *Id.* The investigator told them to turn around, and Petitioner drove Mr. Mayfield back to his house. Petitioner called Mr. Sparks while they were driving and asked where her pistol was located. Mr. Sparks said that "he had it put up." *Id.*

Mr. Sparks called Mr. Mayfield the following day and gave him an alibi to tell police about the night of the murder if he was ever questioned. He told Mr. Mayfield to say that he and Mr. Martindale were fighting about fentanyl in the backseat of the car when Mr. Mayfield scratched Mr. Martindale's face with a fork. *Id.* Mr. Sparks also directed Mr. Mayfield to say that they were drinking in Mississippi at a guy named Timmy's house until 2:30 a.m., and then they went to Mr. Sparks' apartment and "passed out." *Id.* Mr. Mayfield could hear Petitioner in the background during his conversation with Mr. Sparks. Petitioner also sent Mr. Mayfield Facebook messages corroborating the story about the driver's license when the investigator stopped them as well as the alibi that Petitioner and Mr. Sparks created. *Id.*

On cross-examination, Mr. Mayfield agreed that he was untruthful in his first two statements to investigators because he was scared. On redirect examination, he said that he did not have an attorney when he gave his first statement. *Id.*

Mr. Turner's father testified that during the week leading up to the shooting, Mr. Turner asked to borrow money to get Mr. Sparks out of jail. *Id.* Although he had loaned Mr. Turner money for this purpose in the past, he declined to do so this time. The night that Mr. Sparks was released from jail, approximately ten hours before the murder, Mr. Turner's father saw a Facebook post by Petitioner thanking the individuals who helped get Mr. Sparks out of jail, including "the four old friends that kept their word when some blew hot air and gave false hope. We know who real and who isn't s**t." *Id.*

TBI Special Agent Celinda Davidson obtained a formal statement from Petitioner at the Sheriff's Office on the day of the shooting. Petitioner was not considered a suspect at the time, but investigators believed "she may have useful information about the incident that happened." During the interview, Petitioner admitted that she had taken Mr. Martindale to Mr. Sparks' apartment following the shooting. *Id.* at *5. Petitioner told Special Agent Davidson that Mr. Martindale had scratches on his face when she picked him up and was later told that he and Mr. Mayfield had gotten into an altercation. She said that she took Mr. Mayfield to his house that morning from Mr. Sparks' apartment. *Id.*

Petitioner told Special Agent Davidson that she was originally going to drive Mr. Mayfield to an ex-girlfriend's house to retrieve some property, but they were unable to go there because the road was blocked. Petitioner said that Mr. Sparks and Ms. Burcham were at her house between 8:00 and 9:00 p.m. the night before the shooting before leaving to visit a friend in Mississippi. *Id.*

Three days later, as Special Agent Davidson was walking through the Sheriff's Office lobby, she saw Petitioner. She and Petitioner briefly spoke, and Petitioner said that in the week prior to Mr. Turner's murder, she and Ms. Burcham went to his house, and she saw money and drugs "in the dresser." *Id.*

During the investigation, Petitioner was developed as a suspect, and a search warrant was executed at her residence on March 26, 2019. Officers discovered, in a spare bedroom, several of the items that were purchased at Walmart on the night of the murder, including the backpack, shotgun shells, Remington gun oil, holster, bandana, and black pullover. *Id.* The .25 caliber chrome pistol was found in the master bedroom on the bed underneath a pillow, and an empty box of .25 caliber ammunition was located on a bookcase. *Id.*

The jury found Petitioner guilty of first degree premeditated murder, first degree felony murder, and attempted especially aggravated robbery for her actions against Mr. Turner. She was found guilty of attempted first degree murder and aggravated assault with serious bodily injury for her actions against Ms. White. The trial court imposed an effective life sentence. *Id.* *7.

*Post Conviction Hearing*

At the post-conviction hearing, trial counsel testified that he was appointed to represent Petitioner in Circuit Court in 2019. Previous counsel represented her in General Sessions Court. Trial counsel had been practicing law since April of 2014 and eighty-five percent of his practice involved criminal law. He also served as a Magistrate for the Madison County Safe Baby Court. Trial counsel thought that he spoke with Petitioner's previous counsel one time about what occurred during the preliminary hearing. He did not recall if Petitioner told him that previous counsel was in possession of some material beneficial to her case. He agreed that a handwritten letter by Jennifer Lovett sounded "familiar" and Petitioner had given him Ms. Lovett's name, but she was not called as a witness. He did not recall the "exact discussion" with Petitioner about Ms. Lovett.

Trial counsel testified that Petitioner's case was his first trial for first degree murder, but he had handled twelve to fifteen other trials up to that point. He said that no one helped him investigate Petitioner's case. Concerning his investigation, trial counsel testified:

I met with [Petitioner] many times, went over all the discovery. There was ample discovery. It was a T.B.I. file. There were two bankers boxes. I would say hundreds, if not thousands, of pages of discovery, and just went over it and prepared for trial.

Trial counsel said that he did not hire a private investigative service because "I didn't think that there [was] anything that I couldn't handle at this point." He was aware that the State of Tennessee would have paid for a private investigator because Petitioner was indigent, but he did not feel that one was necessary.

Trial counsel testified that he spoke with Special Agent Davidson, but he did not recall speaking with Deborah Earnest or Alyssa Patterson. He recalled testimony at trial about a text message that Petitioner sent to Alyssa Patterson stating, "I got [Mr. Sparks] out. [Mr. Turner] didn't help. He will be dealt with[.]" He said that he questioned the "T.B.I. officer about the text messages in length" and asked the officer why that individual message was "plucked out" of the conversation. Trial counsel agreed that Petitioner and Ms. Patterson also discussed a glass rooster during the text message exchange which he did not "feel would add anything new to that text message thread." He did not contact Ms. Patterson to ascertain whether Petitioner was stating that the person who took the glass rooster would be "dealt with." Trial counsel did not feel that Ms. Earnest or Ms. Patterson would have added anything beneficial to Petitioner's case.

Trial counsel testified that he met with Petitioner "anywhere from seven to ten times just solely coming down here[not for] court appearances." He said they spent several hours going through the "hundreds and hundreds" of pages of discovery. Trial counsel said there were no distractions, and he "was prepared to go to trial and move this case forward." After Petitioner was found guilty at trial, counsel filed a motion for new trial and an appeal. After Petitioner was transferred to Nashville, he spoke with her "multiple, multiple times" when she called his cell phone. Trial counsel was sure that he and Petitioner reviewed the grounds for an appeal, but he could not say that he knew "exactly what she wanted to appeal." He did not recall if he filed a Rule 11 application to the supreme court.

Trial counsel testified that there was a plea offer for twenty years at one hundred percent when he began representing Petitioner. He said, "I believe that we were able to move the needle to some degree, but I don't have anything written as to what that – what that move would have been, but either way it was rejected by [Petitioner] and we proceeded to trial." Trial counsel was sure they discussed the plea offer multiple times "knowing what the circumstances would be if she were to go to trial and lose." He told Petitioner that she could spend the remainder of her life in prison if convicted but he did not recall the exact conversations with her about when she would be eligible for parole. Trial counsel

said that he would have conveyed to her that a life sentence is fifty-one years. He never told her she would be eligible for parole after serving twenty-five years of a life sentence.

Trial counsel agreed that a 911 call was brought up at trial, but he did not recall the circumstances. After reviewing the trial transcript, trial counsel agreed that at trial, he objected to introduction of the call which he had received as part of discovery. He did not recall why he had not listened to the call up to that point noting that it could have been an "audio issue." Trial counsel did not investigate whether Ms. Burcham and Mr. Turner were having a relationship, despite Mr. Turner's engagement to Ms. White, but he was aware that she spent the night with Mr. Turner and slept in his bed. When asked if this could have been beneficial to Petitioner's trial, trial counsel said:, "I think that Ms. Burcham gave different versions of what happened. It would have been yet another - - I believe I pointed out to the jury that she was not someone who told the truth so I don't know how it necessarily would have helped me."

Trial counsel recalled Ms. Burcham testifying at trial concerning a statement by Mr. Sparks as to whether a "situation" had been taken care of, and she said that Mr. Sparks indicated "it should be, I unloaded a whole clip on him." He did not recall objecting to any testimony by Ms. Burcham or Mr. Mayfield concerning statements made by Mr. Sparks nor his reasons for not objecting to the testimony. He said that Mr. Sparks would not have been available to testify at Petitioner's trial because his charges were still pending.

Trial counsel did not feel that he could have done anything differently in Petitioner's case that would have been beneficial. He did everything he could regarding Ms. Burcham's testimony. He said, "I tried to tear all of the individuals who testified against [Petitioner] down as much as I could if there was maybe something else, I could have asked to that, then, yeah, sure I would have."

On cross-examination, trial counsel testified that he received a pretrial order in Petitioner's case related to her trial and important dates which he was sure he discussed with Petitioner. He also filed a motion in limine and a suppression motion. The suppression motion was heard and denied. Trial counsel reviewed all discovery with Petitioner making "several trips [with] several bankers boxes and we went over every scrap of paper that I was given by the State." He was not aware of any exculpatory evidence in the State's possession.

Trial counsel agreed that a plea offer was extended to Petitioner in April of 2020 for twenty years to be served one hundred percent. He conveyed the offer to Petitioner, and she was "adamant" that she wanted a trial. Trial counsel noted that he thought it was a greater risk to go to trial and the "smarter move here" was to enter a plea. He talked to several witnesses and noted that some were represented by counsel. He did not find any

beneficial information in discovery. Trial counsel testified that "there were multiple statements by those individuals who testified, multiple different statements so I believe that I had everything I needed in order to prepare for trial." He had a chance to cross-examine those individuals at trial, and he attempted to discredit their statements. Trial counsel testified:

> I guess the theory of my defense was that these were individuals who were trying to save themselves and they gave multiple statements to law enforcement at multiple times and those stories changed over time and I tried to highlight that fact to the jury, that these individuals were saying whatever they needed to say in order to get themselves a better deal.

Concerning trial strategy, he said:

> That she was not - - the theory that the State was operating under was that she was part of a team, that she was working with [Mr. Sparks] to - - to commit this crime and I guess my theory was trying to distance herself to not be a part of this team, to be sucked into this by her son.

Trial counsel discussed this theory with Petitioner.

Trial counsel testified that Petitioner waived her right to testify at trial. He was sure they had a discussion as to whether she should testify but he could not remember if they had the discussion "outside of court as to what the pros and cons of testifying" would be. They discussed it pretrial and trial counsel did not "think it was a good idea for her to get on the stand." Trial counsel testified that he would have discussed a life sentence with Petitioner and her eligibility for parole.

Trial counsel testified that he filed an appeal in which he raised the denial of the suppression motion and sufficiency as issues. He did not feel any need to meet with Petitioner concerning the grounds for the appeal and made strategic decisions about the grounds raised. He said, "I felt like I was choosing the best course of action and I spoke with [Petitioner] on the phone several times about where we were in the process so if we had a discussion about it, I can't recall it." Trial counsel estimated that in addition to the face-to-face meetings he had with Petitioner, he spoke with her "[d]ozens" of times over his cell phone. Trial counsel agreed that he would have discussed the witnesses he had not talked to, and he did not recall any complaints from Petitioner.

Petitioner testified that trial counsel met with her approximately six times before her "court date" for forty-five minutes to an hour each time. She said that three or four times, he received a call while meeting with her that lasted sometimes ten minutes or longer.

Petitioner testified that trial counsel reviewed the evidence with her closer to trial, and she asked him if he had a good feeling about the case. She agreed that he conveyed the twenty-year plea offer and the last offer was for twenty years at forty percent, which he told her would amount to around six years. Petitioner claimed that trial counsel told her about the plea offer one time the week before trial. Petitioner testified that she again asked trial counsel how he felt about the case "in his gut," and he told her "he had a good feeling in his gut. So, we went with it." When asked if trial counsel influenced her into not accepting the plea offer, Petitioner replied: "Sort of. I mean if your attorney had got a good feeling, you're going to - - when you're taught to take counsel, you know, the advice of your attorney, you're going to do it."

Petitioner testified that she asked trial counsel to speak with Jennifer Lovett who was an inmate in the Hardeman County Jail or obtain a statement Ms. Lovett had written out that was given to Petitioner's initial trial counsel. Petitioner was not aware if Ms. Lovett could be located after her release and noted that neither Ms. Lovett nor initial counsel testified about the letter at trial. Petitioner testified that Deborah Earnest was her grandson's "other grandmother." She asked trial counsel to speak with Ms. Earnest concerning some text messages, but he did not speak with her. Petitioner testified that Alyssa Patterson was her "oldest grandson's mother." She requested that trial counsel also speak with Ms. Patterson about some text messages they exchanged but he did not speak with her. Petitioner testified that both Ms. Earnest and Ms. Patterson would have been available to testify if trial counsel had subpoenaed them.

Petitioner testified that Ms. Burcham had confided in Ms. Lovett and Petitioner about her involvement in a murder and an aggravated burglary in Corinth, Mississippi; she wanted trial counsel to investigate these cases. Petitioner said the text messages exchanged between her and Alyssa Patterson stating, "I got Steven out. Deon didn't help. He will be dealt with" were referring to three different incidents. She claimed the text message "[h]e will be dealt with" was referring to the person who had burglarized Ms. Patterson's house and taken an antique rooster. Petitioner alleged that Ms. Patterson would have been able to "flush that out" at trial.

When asked if there was anything else that trial counsel could have done to investigate Ms. Burcham and Mr. Mayfield, Petitioner said, "he could have investigated their character a little bit further and seen what kind of people they were[.]" She claimed that Mr. Mayfield had been lying and stealing things from someone he was living with, and Ms. Burcham had been involved in the incidents in Mississippi and had "gotten out of it and had had an affair with the victim while my son was incarcerated in the county [jail]." Petitioner testified, "There was ways that [trial counsel] could have flushed it out, I believe, to see that they had, I just want to call it a shady character, that they were out for themselves and seen where they were actually pointing the finger at someone else."

Petitioner testified that trial counsel told her that she faced a potential life sentence if found guilty at trial, and she "didn't want to plead to something that [she] didn't do." When asked if trial counsel discussed release eligibility with her, Petitioner said:

> I signed a paper after our - - after my trial. I went into the - - where the long table is and he got my paperwork out and I signed a paper that said I am sentenced to life, sixty-one years, fifty-one, eligible for parole in twenty-five, and I signed that.

She further testified:

> That was the sentencing paper after my sentencing hearing, which he had told me already what I was going to be sentenced to but we - - he told me that - - I was told I cannot appeal my sentence. I can only appeal my guilt. That's why I had to sign for life at the eligibility of parole at twenty-five.

Petitioner testified that an appeal was filed in her case, but she did not have any input on the issues appealed. She said trial counsel told her that he had raised sufficiency of the evidence and a suppression issue. However, he could not raise additional issues she wanted raised because he had already filed the appeal. Petitioner testified that she had "three appeals." She wanted to appeal to the supreme court, but trial counsel "said something about time had ran out, he had ran out of time."

Petitioner testified that trial counsel did not want her to testify at trial because "I guess he thought they were going to tear me a new one. He didn't think I was mentally able, mentally stable." She agreed that the biggest issue with trial counsel was that he did not thoroughly investigate her case, he did not file for a change of venue, and he did not file a motion to sequester the jury. When asked what else trial counsel could have done in her case, Petitioner testified:

> He should have asked [Ms. Burcham] more questions. He should have asked [Mr. Mayfield] more questions. He should have investigated the [Mississippi] case to see [Ms. Burcham's] involvement, her discrepancies. The evidence that is there, he could have asked [. . .] Mr. Strickland to, you know, validate, well, did [Ms. Burcham] say this, this, and this. You know, he could have done these things that he did not do. There is no evidence, physical, factual evidence that has me more on this case, just word of mouth and a backpack that was brought to my house by my son.

On cross-examination, Petitioner agreed that the original plea offer was for twenty years at one hundred percent. However, she did not want to accept the plea because she

did not want to plead guilty to something that she did not do.  She received a second offer of twenty years at forty percent the week before trial which she also declined.  Petitioner testified:

> Because I asked [trial counsel] if he had a good feeling about it, what he thought he could do, and he said yes, we have a good feeling.  I was like okay, I don't really want to plead guilty to something that I didn't do.  I would like to keep pushing if you can.

She agreed that it was her decision to go to trial.

Petitioner testified that although trial counsel spoke with initial counsel before trial, he never asked initial counsel about the letter written by Jennifer Lovett.  She agreed that Ms. Burcham and Mr. Mayfield both testified against her at trial, and trial counsel cross-examined them and "[m]inutely" attempted to discredit their statements.  She thought that counsel could have "done a better job."  Petitioner agreed that trial counsel also cross-examined them about text messages, and "[h]e actually proved that the text message was time[] dated that it was nothing to do with the incident that they were trying to say it was."  She further agreed that trial counsel effectively discredited the message; however, the State brought the message back up during closing arguments, and trial counsel failed to object.

Petitioner testified that she spoke with trial counsel approximately seven times after trial.  She said they discussed the appeal, and "he stated that he had put on the same thing that he had put in each appeal.  In other words, he didn't change it so there was no need in discussing it."

The post-conviction court accredited trial counsel's testimony and made the following findings:[2]

> The Court finds that [trial counsel] provided adequate assistance; [trial counsel] met with Petitioner and discussed the case, including possible defenses and negotiated plea opportunities.  [Trial counsel] presented a reasonable defense for the [Petitioner], but a jury did not accept the defense.
>
> Petitioner failed to show any deficient performance by [trial counsel] or that she was prejudiced.  The facts did not permit a reasonable finding of not

---

[2] We note that at the beginning of its order, the post-conviction court stated that the "[m]ajor point of contention" was that trial counsel did not present testimony Petitioner thought should have been presented, did not request a change of venue or sequestration of the jury, did not sufficiently meet with and call witnesses, did not adequately discredit adverse witnesses, encouraged Petitioner not to testify "against her desire," and did not pursue certain issues on appeal.  Petitioner did not raise all of these grounds on appeal.

- 13 -

guilty. [Trial counsel] explained to [Petitioner] the difficulty of a trial based on the facts which he expected to be presented by the State, yet he indicated that he would give her a zealous representation and felt good about the representation he provided.

The Court finds that [Petitioner] has failed to establish the factual allegations contained in her petition by clear and convincing evidence. [Petitioner] has not shown that (a) the services rendered by trial counsel were deficient and (b) the deficient performance was prejudicial. [Petitioner] has not shown that the services rendered or the advice given was below the range of competence demanded of attorneys in criminal cases. [Petitioner] has not shown that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. [Petitioner] has not shown that she was incapable of defending [her]self in a court of law.

It is from this ruling that Petitioner now appeals.

**Analysis**

Petitioner contends that trial counsel rendered deficient performance by failing to investigate three alibi witnesses, failing to adequately prepare for trial, and failing to object to multiple hearsay statements. She further argues that she is entitled to relief under cumulative error because "trial counsel's collective errors in this case resulted in an unfair trial with an unreliable result." The State responds that trial counsel "acted competently in his review of discovery, investigation of the State's witnesses, cross-examination of the State's witnesses, as well as the development of a reasonable defense strategy." The State further argues that Petitioner did not present witnesses at the post-conviction hearing to show actual prejudice to her case, and she waived some claims by not raising them in her post-conviction petition.

Under the Post-Conviction Procedure Act, a criminal defendant may seek relief from a conviction or sentence that is "void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. As such, "[t]he deprivation of effective assistance of counsel is a constitutional claim cognizable under the Post-Conviction Procedure Act." *Howard v. State*, 604 S.W.3d 53, 57 (Tenn. 2020) (quoting *Moore v. State*, 485 S.W.3d 411, 418 (Tenn. 2016)).

- 14 -

"Appellate review of an ineffective assistance of counsel claim is a mixed question of law and fact that this Court reviews de novo." *Phillips v. State*, 647 S.W.3d 389, 400 (Tenn. 2022) (citing *Dellinger v. State*, 279 S.W.3d 282, 294 (Tenn. 2009)). However, the post-conviction court's factual findings are conclusive on appeal unless evidence preponderates against them. *Howard*, 604 S.W.3d at 57 (citing Tenn. R. App. P. 13(d)); *see also Arroyo v. State*, 434 S.W.3d 555, 559 (Tenn. 2014); *Fields v. State*, 40 S.W.3d 450, 456, n.4 (Tenn. 2001). Accordingly, as an appellate court, we are not to re-weigh or re-evaluate the evidence or substitute our inferences for those drawn by the post-conviction court. *State v. Honeycutt*, 54 S.W.3d 762, 766 (Tenn. 2001). In general, we defer to a post-conviction court's findings concerning witness credibility, the weight and value of witness testimony, and the resolution of factual issues presented by the evidence. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015); *Whitehead v. State*, 402 S.W.3d 615, 621 (Tenn. 2013).

When a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993); *Kendrick*, 454 S.W.3d at 457. Deficient performance is representation that falls below "an objective standard of reasonableness" as measured by prevailing professional norms. *Kendrick*, 454 S.W.3d at 457 (quoting *Strickland*, 466 U.S. at 688); *see also Baxter v. Rose*, 523 S.W.2d 930, 932-33 (Tenn. 1975). A defendant asserting ineffective representation must overcome the strong presumption that counsel exercised reasonable judgment in all significant decisions. *Strickland*, 466 U.S. at 687-89; *Burt v. Titlow*, 571 U.S. 12, 22-23 (2013); *Kendrick*, 454 S.W.3d at 458; *Nesbit v. State*, 452 S.W.3d 779, 788 (Tenn. 2014).

To show prejudice, a petitioner must demonstrate a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694; *Kendrick*, 454 S.W.3d at 458. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Reasonable probability is a lesser burden of proof than preponderance of the evidence. *Kendrick*, 454 S.W.3d at 458 (citing *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). When the proof of guilt is overwhelming, proving prejudice is exceedingly difficult. *See Proctor v. State*, 868 S.W.2d 669, 673 (Tenn. Crim. App. 1992); *Bray v. State*, No. M2011-00665-CCA-R3-PC, 2012 WL 1895948, at *6 (Tenn. Crim. App. May 23, 2012) (finding that, in light of overwhelming evidence, petitioner could not demonstrate prejudice); *McNeil v. State*, No. M2010-00671-CCA-R3-PC, 2011 WL 704452, at *6 (Tenn. Crim. App. Mar. 1, 2011) (finding that overwhelming evidence of guilt precluded showing of prejudice from admission of evidence at trial).

Failure to satisfy either prong results in the denial of relief. *Strickland*, 466 U.S. at 697; *Nesbit*, 452 S.W.3d at 786-87. Accordingly, if either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). "[T]he petitioner is required to prove the fact of counsel's alleged error by clear and convincing evidence." *Phillips*, 647 S.W.3d at 401 (quoting *Dellinger*, 279 S.W.3d at 294); *see also* T.C.A. § 40-30-110(f); Tenn. Sup. Ct. R. 28, § 8(D)(1).

First, Petitioner contends that trial counsel rendered deficient performance by failing to investigate three alibi witnesses: Jennifer Lovett, Alyssa Patterson, and Deborah Earnest, who could have shown that she was not involved in Mr. Turner's murder. However, in order "[t]o succeed on a claim of ineffective assistance of counsel for failure to call a witness at trial, a post-conviction petitioner should present that witness at the post-conviction hearing." *Pylant v. State*, 263 S.W.3d 854, 869 (Tenn. 2008) (citing *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990)). "As a general rule, this is the only way the petitioner can establish that ... the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner." *Id.* Because Petitioner failed to call any of the three alibi witnesses during the post-conviction hearing, and she has not alleged in her brief or presented any other evidence as to what their testimony would have been at trial, she failed to meet her burden of proving her allegations of ineffective assistance by clear and convincing evidence. *See id.* This issue is without merit.

Second, Petitioner argues that trial counsel rendered deficient performance by failing to adequately prepare for trial, thus depriving her of a fair trial. She contends that trial counsel failed to speak with key witnesses, investigate critical evidence in the form of a 911 call received in discovery that would have allowed her to make informed pretrial decisions, and failed to correctly inform her of the potential penalties for first degree murder. Petitioner further states in her brief that "[t]rial counsel's post-conviction testimony does not indicate any level of preparation." The State contends trial counsel was not deficient in his investigation of the 911 call and that Petitioner has not shown any prejudice. The State further argues that Petitioner waived his claim as to the potential penalties for first degree murder by failing to raise the issue in her post-conviction petition, and the post-conviction court did not address it.

Initially, we point out that Petitioner does not identify any key witnesses in her brief that trial counsel failed to speak with or make any further argument as to this claim. As noted above, she did not present any key witnesses at the post-conviction hearing. *Pylant*, 263 S.W.3d at 869. As to the 911 call, Petitioner makes a conclusory statement in her brief that trial counsel "acknowledged receiving a copy of a 911 call in discovery, however he declined to review that call." Petitioner does not explain how trial counsel rendered

deficient performance by not reviewing the call or how this was detrimental to her case or that counsel would have uncovered information favorable to Petitioner's case. At the post-conviction hearing, trial counsel testified that he objected to the introduction of the call at trial. He acknowledged that he would have received the call in discovery and did not know why he had not reviewed the call, except for a possible "audio issue." This alone does not establish deficient performance or show that Petitioner was in any way prejudiced by trial counsel's failure to review the call prior to trial. For purposes of proving an ineffective assistance of counsel claim, proof of deficient representation by omission requires more than a speculative showing of a lost potential benefit." *Owens v. State*, 13 S.W.3d 742, 756 (Tenn. Crim. App. 1999). Thus, Petitioner has not proven her allegations of fact concerning this issue by clear and convincing evidence.

As for trial counsel's alleged failure to correctly inform her of the potential penalties for first degree murder, we disagree with the State that this claim is waived. "Tennessee appellate courts may only consider issues that were not formally raised in the post-conviction petition if the issue was argued at the post-conviction hearing and decided by the post-conviction court without objection." *Holland v. State*, 610 S.W.3d 450, 458 (Tenn. 2020); *See Fitts v. State*, No. M2024-00565-CCA-R3-PC, 2025 WL 3124142, at *5 (Tenn. Crim. App. Nov. 7, 2025); *perm. app filed* (finding that "[d]espite our concerns with whether the petitioner complied with the statutory mandates, our review of the original pro se petition and the proof presented, or not presented, at the hearing reveals the petitioner is not entitled to relief"); *Starner v. State*, No. M2018-01015-CCA-R3-PC, 2019 WL 3856852, at *13 (Tenn. Crim. App. Aug. 16, 2019) (holding that an issue was "reviewable on the merits" because the petitioner argued it during the post-conviction hearing with no objections); *Williams v. State*, No. W2018-01269-CCA-R3-PC, 2019 WL 2407157, at *11 (Tenn. Crim. App. June 7, 2019) (interpreting Tennessee Supreme Court Rule 28, section 8(D)(5) to hold that an issue may not be waived if it was "raised at the post-conviction hearing and ruled on by the post-conviction court" without objection because the petitioner would not have been aware of the need to amend the petition to include the issue); *Matthews v. State*, No. W2018-00966-CCA-R3-PC, 2019 WL 1110101, at *9 (Tenn. Crim. App. Mar. 11, 2019) (considering an issue on the merits that was not specifically mentioned in the post-conviction petition, though alleged generally, because it was litigated at the post-conviction hearing without objection); *Brown v. State*, No. W2017-01755-CCA-R3-PC, 2019 WL 931735, at * 10 (Tenn. Crim. App. Feb. 22, 2019) (considering an issue not included in petition but argued at the post-conviction hearing without objection); *Yarboro v. State*, No. W2017-00125-CCA-R3-PC, 2018 WL 4441364, at *7 (Tenn. Crim. App. Sept. 17, 2018) (deciding an issue not presented in the petition because it was argued at the post-conviction hearing and not objected to by opposing counsel and petitioner was no longer able amend the petition); *State v. Herron*, No. 03C019109-CR-00284, 1992 WL 43273, at *4 (Tenn. Crim. App. Mar. 10, 1992) ("On the other hand, if an issue is not

specially pled, we do not view [our case law] as prohibiting a trial court from ruling on it if it is litigated by the parties in a post-conviction hearing without objection.").

In this case, trial counsel's alleged failure to correctly inform Petitioner of the potential penalties for first degree murder was raised at the post-conviction hearing and argued in closing without objection by the State, and although the trial court did not make a specific finding concerning this claim, it made general findings that trial counsel did not render deficient performance. *See Pruitt v. State*, No. W2019-00973-CCA-R3-PD, 2022 WL 1439977, at *82 (Tenn. Crim. App. May 6, 2022) (concluding that the testimony presented at the post-conviction hearing along with the post-conviction court's "general denial of the petition" created a record "sufficient for meaningful appellate review"). Therefore, we will consider this issue.

Again, Petitioner has failed to prove her allegations of fact concerning this issue by clear and convincing evidence. In her brief, Petitioner merely states that "it is questionable whether trial counsel correctly informed [her] about the potential penalties a first-degree murder conviction would carry, almost certainly impacting her decision to have a trial." She further asserts that when questioned about the penalties at the post-conviction hearing, trial counsel struggled to answer, "at one point stating 'I don't know' when asked when [Petitioner] would be eligible for parole." Petitioner does not state in her brief what trial counsel told her about the potential penalties for first degree murder nor explain how this affected her decision to go to trial.

At the post-conviction hearing, trial counsel testified that he told Petitioner she could spend the remainder of her life in prison if convicted but he did not recall the exact conversations with her about when she would be eligible for parole. He said he would have conveyed to her that a life sentence is fifty-one years. He never told her she would be eligible for parole after serving twenty-five years of a life sentence. The post-conviction court specifically accredited trial counsel's testimony, and Petitioner has presented no evidence showing that trial counsel incorrectly advised her concerning the possible penalties for first degree murder. The record does not preponderate against the post-conviction court's finding that Petitioner failed to prove by clear and convincing evidence that trial counsel rendered deficient performance. Additionally, both trial counsel and Petitioner testified that she rejected both plea offers and wanted to go to trial. Trial counsel specifically testified that "[m]ultiple times she told me that she was not guilty and that we were going to trial." He also said Petitioner was "adamant" about going to trial. Thus, Petitioner cannot demonstrate any prejudice as to this claim.

Third, Petitioner contends that trial counsel rendered deficient performance by failing to object to hearsay testimony by Ms. Burcham and Mr. Mayfield concerning statements allegedly made by Mr. Sparks concerning Mr. Turner's murder. The State again

- 18 -

argues that this issue is waived because it was not raised in the post-conviction petition or ruled on by the post-conviction court. However, because this issue was raised at the post-conviction hearing without objection by the State, and the post-conviction court made general findings that trial counsel's performance was not deficient, we will consider this issue. And we again conclude that Petitioner has not proven her allegations of fact by clear and convincing evidence. In her brief, Petitioner does not specifically allege which statements were improper hearsay nor does she argue how these statements affected the outcome of her trial. Petitioner alleges only that Ms. Burcham and Mr. Mayfield testified against her at trial and "repeatedly answered questions that Steven Sparks actually made in regards to the actual murder" and that trial counsel did not object to any of the statements. Petitioner further points out that Mr. Sparks was unavailable to testify at trial and could not be cross-examined and that "[t]his was ultimately a corroborating statement of guilt by an unavailable witness, which was almost certainly prejudicial to the appellant."

At the post-conviction hearing, trial counsel recalled Ms. Burcham testifying about a statement by Mr. Sparks regarding whether a "situation" had been taken care of, and she said that Mr. Sparks indicated that "it should be, I unloaded a whole clip on him." Trial counsel did not recall objecting to any testimony by Ms. Burcham or Mr. Mayfield nor his reasons for not objecting to the testimony. However, trial counsel testified that he did everything he could relating to Ms. Burcham's testimony and tried to "tear all of the individuals who testified against [Petitioner] down as much as I could." Trial counsel said he attempted to discredit statements of Ms. Burcham and Mr. Mayfield who testified against Petitioner pointing out that they gave multiple statements to law enforcement with their stories changing over time. Trial counsel "tried to highlight that fact to the jury, that these individuals were saying whatever they needed to say in order to get themselves a better deal." Clearly, trial counsel made a strategic decision as to how to handle Ms. Burcham's and Mr. Mayfield's testimony. "We have repeatedly refused to second-guess counsel's strategic decision to present or to forego a particular theory of defense when such decision was reasonable under the circumstances." *Felts v. State*, 354 S.W.3d 266, 281 (Tenn. 2011) (citation omitted). The record does not preponderate against the post-conviction court's finding that Petitioner failed to prove that trial counsel rendered deficient performance or that any deficiency caused her prejudice on this ground.

Finally, Petitioner claims that she is entitled to relief based on cumulative error. In the post-conviction context, "a petitioner cannot successfully claim he was prejudiced by trial counsel's cumulative error when the petitioner failed to show trial counsel's performance was deficient." *Clardy v. State*, No. M2017-01193-CCA-R3-PC, 2018 WL 5046032, at *7 (Tenn. Crim. App. Oct. 17, 2018) (citing *Gooch v. State*, No. M2014-00454-CCA-R3-PC, 2015 WL 498724, at *10 (Tenn. Crim. App. Feb. 4, 2015)). Because we have concluded that trial counsel's performance was not deficient and that there is no error in the judgment of the post-conviction court, there is no aggregate effect, and

Petitioner was not deprived of her right to a fair trial. Petitioner is not entitled to relief on this issue.

## CONCLUSION

Based on the foregoing reasons, the judgment of the post-conviction court is affirmed.

s/*Jill Bartee Ayers*
JILL BARTEE AYERS, JUDGE